THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

REBECCA PEER,

CASE NO. C11-0879-JCC

10

Plaintiff,

ORDER DENYING SUMMARY
JUDGMENT

11

12

v.

13

F5 NETWORKS, INC. et al.,

14

Defendants.

15     This matter comes before the Court on Defendant F5 Networks Inc.'s motion for

16   summary judgment (Dkt. No. 16) and Plaintiff's motion for partial summary judgment (Dkt. No.

17   15). Having thoroughly considered the parties' briefing and the relevant record, the Court finds

18   oral argument unnecessary and hereby DENIES both motions for the reasons explained herein.

19   **I.      BACKGROUND**

20     This case concerns the firing of Plaintiff Rebecca Peer ("Ms. Peer") by her employer F5

21   Networks, Inc. ("F5"), a multinational networking appliances company.[1] Ms. Peer began

22   working with F5 in a temporary position in February 2010. In March 2010, she was offered a

23   full-time position as a Technical Support Coordinator. In April 2010, Ms. Peer told F5 that she

24   was experiencing chronic pain and requested an accommodation. In conjunction with the

25

26

[1] The facts set out in this background section are undisputed unless otherwise indicated.

1  accommodation process, Ms. Peer's primary care provider – Sandra Lord, M.D. – suggested that

2  she work fewer hours per week on a limited basis, and F5 implemented this accommodation by

3  changing Ms. Peer's schedule to 30 hours per week (down from 40 hours). In order to maintain

4  full-time status, Ms. Peer was required to use paid and unpaid time off to make up for the ten

5  fewer hours of work each week and was told that she could file a short-term disability claim for

6  the lost wages.

7  On May 20, 2010, Ms. Peer was referred to a psychiatrist for help in dealing with

8  depression. On June 1, 2010, Dr. Deborah Cowley, a board certified psychiatrist, diagnosed Ms.

9  Peer with major depression and recommended medication management and psychotherapy.

10  On July 1, 2010, Ms. Peer obtained a medical release to return to a 40-hour work week

11  from a physician assistant associated with her primary care provider. (Dkt. No. 15 at 19.) She

12  began this schedule on July 5, 2010. (Dkt. No. 15 at 21.) Later that month, Ms. Peer found out

13  that she had been assigned to an early shift – 6:00 a.m. to 3:00 p.m. On July 23, 2010, in an

14  email to her supervisor, she expressed frustration about being assigned this shift, stating that

15  "this shift is really stressing me out and exhausting me" and that the "thought of having to do it

16  for another six or eight months or longer is making me really depressed." (Dkt. No. 15 at 28.)

17  On July 24, 2010, Ms. Peer sent a message to her manager on Facebook apologizing for

18  her email the day before and stating, *inter alia*, that:

19
20
21
22
   . . . I start crying the instant my alarm goes off in the morning and don't stop until I finally get to sleep at night. All I do all day at work for the past week is dream up practical ways to kill myself that won't require the people I love to clean up the mess. I've thought about going to the hospital, but don't think it would do me much good since I'm allergic to most psychotropic drugs, and that's really all they could do for me anyway. . . .

23  (Dkt. No. 15 at 4.)

24  On July 29, 2010, Ms. Peer posted a note on her Facebook page that said "work feels like

25  a war zone. I have some serious PTSD. Walked in the building and automatically started puking

26  this morning." (Dkt. No. 15 at 4-5.)

ORDER DENYING SUMMARY JUDGMENT
PAGE - 2

1    On August 3, 2010, Ms. Peer met with her manager, Sandie Milton, and another manager,

2  Jerry Stalick. According to F5, Ms. Peer stated during this meeting that she had been untruthful

3  with her doctor when seeking the work release that allowed her to return to work in early July

4  and that she was at work that week in violation of her doctor's order. (Dkt. No. 16 at 7-8.)

5  However, according to Ms. Peer, she did not lie to her doctor, nor did she tell Ms. Milton and

6  Mr. Stalick that she had lied to her doctors. (Dkt. No. 15 at 5.)

7    On August 4, 2010, F5's Director of Human Resources, Nancy Apgood, and the Human

8  Resources Business Partner for Ms. Peer's group met with Ms. Peer, expressed concern about

9  her health, and told her that she would receive paid leave for the next two days to meet with her

10 doctor. In a letter dated the same day, Ms. Apgood informed Ms. Peer that "[y]ou will not be

11 authorized to return to work until you have a valid work release from your doctor, which must be

12 based on accurate information that you provide to that provider." (Dkt. No. 15 at 36.) Ms.

13 Apgood enclosed a copy of F5's accommodation request form with the letter. (Dkt. No. 15 at 5.)

14 On August 5, 2010, Ms. Peer's primary care provider, Dr. Lord, signed a letter confirming that

15 she had been released to work full time since July 5, 2010. (Dkt. No. 15 at 39.)

16   On August 9, 2010, Ms. Peer returned to work. However, that morning, she was informed

17 that F5 could not allow her to return to work under the present conditions and received a letter

18 providing, *inter alia*, as follows:

19 
20    Becca, again, our foremost concern is for your well-being. Since our meeting on
    Wednesday, additional information has come to our attention about various
21    matters that have arisen. We learned today that very recently, you linked certain
    job matters with specific suicidal thoughts. In view of this, the Company is
22    concerned that you are not able to perform your job functions without
    accommodation, and that attempting to perform your job functions now presents
23    direct risks or threat. Under these circumstances, the Company cannot allow you
    to presently return to your position . . . .

24
    You are eligible for consideration of reasonable accommodation(s), such as a
25    period of unpaid leave. If you wish to pursue accommodations, here is another set
    of the forms that you should work with your doctor about. The Company is
26    absolutely willing to work with you and your medical provider in an interactive

ORDER DENYING SUMMARY JUDGMENT
PAGE - 3

1
2

process about what accommodations you may need to perform the essential functions of your job without the kinds of direct risks or threats that presently exist.

3

(Dkt. No. 15 at 41.)

4

Over the next few days, Ms. Peer attempted to communicate with various individuals at

5

F5 to clarify what documentation was needed. In a letter dated November 10, 2010, Nancy

6

Apgood told Ms. Peer she needed to direct all communications to her and that "[y]our working

7

with your doctor, filling out the appropriate paperwork, and then interacting with the Company is

8

required for the Company to consider returning you to your position." (Dkt. No. 15 at 43.)  In a

9

letter dated November 12, 2010, Ms. Apgood wrote to Ms. Peer, *inter alia*, that:

10
11
12
13

Because of the suicidal ideations that you have communicated to co-workers, and your linkage, at least in part, to your job or certain co-worker(s), the Company has an objective concern that you pose a risk and threat of harm to yourself. If you choose to engage in the "interactive process" regarding these issues, you must provide your doctor with the paperwork, including the cover letter to your medical provider, and consent to that provider's engaging in the interactive process.

14

(Dkt. No. 15 at 45.) Ms. Peer was given a deadline of August 18, 2010 to submit the appropriate

15

paperwork.

16

On August 13, 2010, Ms. Apgood confirmed receipt of phone messages from Ms. Peer

17

requesting clarification as to the accommodation process. (Dkt. No. 15 at 48.) In response, Ms.

18

Apgood stated that "[t]he accommodation process should be one that is familiar to your medical

19

providers. The paperwork that we have provided includes the information that you and they need

20

in order to work in this process." (*Id*.) On the same day, Ms. Peer replied to Ms. Apgood, stating

21

that her doctors were refusing to fill out a request for accommodation due to their belief that she

22

was doing well in therapy and did not need a work accommodation. (Dkt. No. 15 at 51.) Ms.

23

Peer further noted that her doctors were "questioning the circumstances surrounding the

24

company's request that [she] ask for an accommodation." (*Id*.) Ms. Peer went on to state: "I love

25

my job more than any job I've ever had, and want very much to cooperate with F5 in any way

26

possible and try to find a solution to this issue so that I can stay with the company." (*Id*.) She

ORDER DENYING SUMMARY JUDGMENT
PAGE - 4

1   also offered to provide a letter from her psychiatrist giving the specifics of her care and verifying

2   that she posed neither a threat to herself or others. (*Id*.) On August 16, 2010, Ms. Peer emailed

3   Ms. Apgood, requesting an update on the situation and referring to the offer of her psychiatrist to

4   submit a letter. (*Id*.) In response, Ms. Apgood did not address Ms. Peer's offer of a letter from

5   her psychiatrist but again reiterated the company's position that "[i]t is not sufficient for you to

6   simply obtain a work release from your doctor, given the statements you made about potential

7   self-harm and suicide related to your employment." (*Id*.) Ms. Apgood went on to state that "I

8   encourage you to work with your medical professionals, share the sample cover letter sent to you

9   earlier coupled with the Accomodation form, and engage in the interactive process." (*Id*.) On

10   August 18, 2010, Ms. Peer's psychiatrist submitted a letter and medical inquiry form in which

11   she opined that there was no evidence that Ms. Peer was unable to routinely perform her job

12   functions or that she required an accommodation, other than time to go to mental health

13   appointments and permission to leave work early if she becomes very stressed. (Dkt. No. 15 at

14   56-57.)

15          On August 20, 2010, Nancy Apgood sent Ms. Peer a "Notice of Separation" letter that

16   referenced prior communications and stated that "[b]ecause you and your doctor did not address

17   the issue of whether you remained a threat of harm, and the linkage you made to your job, F5 is

18   separating your employment as of August 20, 2010." (Dkt. No. 15 at 60.)

19          Following her termination, Ms. Peer sued F5 for employment discrimination and failure

20   to accommodate under the Americans with Disabilities Act ("ADA") and the Washington Law

21   Against Discrimination ("WLAD") and for wrongful discharge in violation of public policy.

22   (Dkt. No. 3-1). F5 now moves for summary judgment, arguing that there are no triable issues of

23   fact as to whether F5 discharged Ms. Peer in violation of the applicable law. In turn, Ms. Peer

24   moves for partial summary judgment on the issue of F5's liability for breaches of employment

25   law, claiming that the only remaining issues of fact pertain to the amount of compensation that

26   she is owed.

1  II.  DISCUSSION

2       A.       Applicable Law

3            Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary

4  judgment "if the movant shows that there is no genuine dispute as to any material fact and the

5  movant is entitled to judgment as a matter of law." An issue of fact is genuine if there is

6  sufficient evidence for a reasonable jury to find for the nonmoving party. *Anderson v. Liberty*

7  *Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). At the summary judgment stage, evidence must be

8  viewed in the light most favorable to the nonmoving party, and all justifiable inferences are to be

9  drawn in the nonmovant's favor. *Id*. at 255. The party seeking summary judgment bears the

10 initial burden of informing the Court of the basis of its motion and identifying those portions of

11 the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

12 affidavits, if any, that it believes demonstrate the absence of any genuine issue of material fact.

13 *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In reviewing the evidence "the court must

14 draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility

15 determinations or weigh evidence." *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133,

16 150 (2000).

17          The ADA[2] prohibits employers from discriminating against a disabled employee by "not

18 making reasonable accommodations to the known physical or mental limitations of an otherwise

19 qualified individual with a disability who is an applicant or employee, unless such covered entity

20 can demonstrate that the accommodation would impose an undue hardship on the operation of

21 the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The Act defines a "qualified

22 individual with a disability" as "an individual with a disability who, with or without reasonable

23 accommodation, can perform the essential functions of the employment position that individual

24 _____

25          [2] The analysis under the ADA and WLAD is similar. Therefore, in the interest of

26 simplicity, the analysis in this order is focused on Ms. Peer's ADA claims. The same general
   principles and conclusions apply with respect to Ms. Peer's WLAD claims.

ORDER DENYING SUMMARY JUDGMENT
PAGE - 6

1  holds or desires." *Id.* at § 12111(8).

2      "An employer may require, as a qualification standard, that an individual not pose a

3  direct threat to the health or safety of himself/herself or others." 29 C.F.R. § 1630.2(r). "If,

4  however, an individual poses a direct threat as a result of a disability, the employer must

5  determine whether a reasonable accommodation would either eliminate the risk or reduce it to an

6  acceptable level." *Id*.

7      Where an employee requests accommodation for his or her disability, or where an

8  employer recognizes the need for such an accommodation, the employer has an affirmative

9  obligation to engage in an "interactive process" with the employee to determine if an appropriate

10  reasonable accommodation can be made. *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112-1114 (9th

11  Cir. 2000).[3] "The interactive process is at the heart of the ADA's process and essential to

12  accomplishing its goals. It is the primary vehicle for identifying and achieving effective

13  adjustments which allow disabled employees to continue working without placing an 'undue

14  burden' on employers." *Id*. at 1113. During the interactive process, the parties must "exchange

15  essential information" and "neither side can delay or obstruct the process." *Id*. at 1115.

16  Summary judgment is not available "if there is a genuine dispute as to whether the employer

17  engaged in good faith in the interactive process." *Id*. at 1116.

18      **B.      Defendant F5's Claim for Summary Judgment**

19      F5 argues that Plaintiff cannot meet her prima facie case of showing that she was a

20  "qualified individual" who was terminated because of her disability because (1) it had objective

21  reason to believe that Ms. Peer posed a direct threat to herself; and (2) Ms. Peer failed to engage

22  in good faith in the interactive process that would have enabled F5 to determine conclusively

23  whether Ms. Peer posed a direct threat to herself, and whether, if so, a reasonable

24  _____

25      [3] "The interactive process is triggered by either a request for accommodation by a

26  disabled employee or by the employer's recognition of the need for such an accommodation."
*Barnett*, 228 F.3d at 1112.

1   accommodation could be made. (Dkt. No. 23 at 8-9.) Ms. Peer contests this characterization of

2   her condition or behavior, and charges that F5 was the party who failed to interact in good faith

3   because it unilaterally ended the interactive process, purportedly because her physician had not

4   given F5 precisely the information it sought, even though F5 had not specifically requested it and

5   Ms. Peer had unsuccessfully tried to clarify exactly what F5 needed. (Dkt. No. 24 at 9.)

6       The Court finds that F5 has not met its threshold burden of showing the absence of any

7   genuine issue of fact with respect to whether Ms. Peer acted in good faith in conjunction with the

8   interactive process. While F5 claims that Ms. Peer obstructed the interactive process by refusing

9   to provide information that it "repeatedly confirmed that [it] needed to have addressed"[4] – this

10  apparently being a letter from her doctor confirming that she did not pose a direct threat – F5's

11  assertion is far from conclusively established on the basis of the available evidence. F5's

12  communications with Ms. Peer refer to the need for her to engage in the "interactive process"

13  and to collaborate with her medical provider to submit relevant paperwork, but they provide little

14  in the way of specifics as to what engaging in the interactive process actually means or what

15  types of attestations would be required. Furthermore, Ms. Peer has submitted evidence that she

16  made numerous attempts to pinpoint precisely what paperwork was needed, to little avail.

17  Viewing the evidence in the light most favorable to Ms. Peer, and drawing all justifiable

18  inferences in her favor, the Court finds that a reasonable jury could find that Ms. Peer acted in

19  good faith, and that it was F5, rather than Ms. Peer, who was responsible for the breakdown in

20  the interactive process.[5] Accordingly, summary judgment in favor of F5 on the basis of its direct

21  threat defense is inappropriate.

22      **C.      Plaintiff Rebecca Peer's Claim for Partial Summary Judgment**

23      In contrast to F5, Ms. Peer does not move to resolve the case fully on summary

24  _____

25      [4] (Notice of Separation Letter (Dkt. No. 60 at 59).)

26      [5] Ms. Peer claims that F5's letters to her were deliberately vague and intended to confuse
    and frustrate her while appearing to comply with the law. (Dkt. No. 22 at 2.)

ORDER DENYING SUMMARY JUDGMENT
PAGE - 8

1   judgment. However, Ms. Peer does seek to limit the issues for trial, arguing that there are no

2   genuine issues of material fact that require a trial other than the issue of appropriate

3   compensation for F5's violations of the applicable employment law. (Dkt. No. 15 at 12.)  As to

4   liability, Ms. Peer claims that she has established a *prima facie* case of employment

5   discrimination and that F5 has failed to produce substantial evidence to support its direct threat

6   defense.

7        In order to establish a *prima facie* case of employment discrimination under the ADA, a

8   plaintiff must show that (1) she is a disabled person within the meaning of the ADA; (2) she is a

9   qualified individual, meaning she can perform the essential functions of her job, with or without

10  reasonable accommodation; and (3) her employer terminated her because of her disability. *See*

11  *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).

12       The Court finds that Ms. Peer has not established that no triable issues of fact remain as

13  to F5's liability for employment discrimination. F5 has produced substantial evidence in support

14  of its direct threat defense, including Ms. Peer's communications to co-workers in which she

15  appears to draw a link between her work and her suicidal ideation. The conflict between the

16  parties' arguments and evidence is precisely the sort of genuine issue that can only be resolved

17  by the trier of fact—in this case the jury. Therefore, the Court must deny the Plaintiff's motion

18  for partial summary judgment.

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

ORDER DENYING SUMMARY JUDGMENT
PAGE - 9

1    **III.    CONCLUSION**

2          For the foregoing reasons, the Court finds that genuine issues of material fact exist that

3    preclude the Court from entering judgment as a matter of law. Accordingly, the Court DENIES

4    Defendant F5 Networks Inc.'s motion for summary judgment (Dkt. No. 16) and Plaintiff's

5    motion for partial summary judgment (Dkt. No. 15).

6          DATED this 19th day of March 2012.

7

8

9

10                                          John C. Coughenour
                                            UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER DENYING SUMMARY JUDGMENT
PAGE - 10